IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2014 JUL -7 PM 2:22
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
          DEPUTY

ALTAIRIA CORPORATION d/b/a Altairia
International Corp.,
                Plaintiff,

-vs-                                                    Case No. A-14-CA-471-SS

WOODBOLT DISTRIBUTION, LLC and
GENERAL NUTRITION CORPORATION,
                Defendants.

## ORDER

BE IT REMEMBERED on the 30th day of June, 2014, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court are Plaintiff Altairia Corporation's Motion for Temporary Restraining Order and Preliminary Injunction [#7], and Defendants Woodbolt Distribution, LLC and General Nutrition Corporation's Response [#17]; and Plaintiff Altairia Corporation's Motion for Substituted Service [#9].[1] Having considered the documents, the file as a whole, the governing law, and the parties' arguments at the hearing, the Court enters the following opinion and orders DENYING the motion for temporary restraining order and preliminary injunction.

### Background

This is an action for trademark infringement, unfair competition, and trademark dilution under the Lanham Act and the Texas trademark statute. In short, Plaintiff Altairia Corporation sells

---

[1] Since the filing of this motion for substituted service, Defendant Woodbolt has filed a Waiver of the Service of Summons [#19], and therefore the motion is dismissed as moot.

a pre-canned, liquid energy drink called NEON ENERGY DRINK. Altairia has a registered trademark in NEON ENERGY DRINK, which it applied for in May 2012 and the U.S. Patent and Trademark Office (USPTO) issued in March 2013. Altairia filed this lawsuit on May 21, 2014, claiming Defendant Woodbolt Distribution LLC is infringing its trademark by advertising and selling its NEON SPORT products through Defendant General Nutrition Corporation (GNC)—a national chain with over 7,000 retail stores, GNC's website, and bodybuilding.com.[2] Woodbolt sells four different NEON SPORT products, which are all dietary supplements: (1) NEON SPORT VOLT, (2) NEON SPORT KINETIC, (3) NEON SPORT SURGE, and (4) NEON SPORT INTERCEPT.[3]

In September 2012 and January 2013, Woodbolt filed its own trademark applications for the NEON SPORT products, and the USPTO denied each in April 2013 on the grounds they were confusingly similar to Altairia's NEON ENERGY DRINK mark. Woodbolt's lawyer attempted to negotiate a "Co-Existence Agreement," with Altairia's founder and CEO, a small entrepreneur with limited legal knowledge. This contract would allow Altairia to sell under its trademark and Woodbolt under its trade name without the threat of legal action. Ultimately, Altairia's CEO refused to sign the document drafted by Woodbolt's attorney, and the two sides never reached an agreement. Nevertheless, Woodbolt proceeded to market with its NEON SPORT products in roughly May 2013.

---

[2] Woodbolt's representative testified at the hearing the NEON SPORT products were only sold in the United States through these three channels: (1) GNC's retail stores; (2) GNC's website; and (3) bodybuilding.com.

[3] The NEON SPORT products target fitness and workout enthusiasts, and the four products are designed to be used at different phases of a workout regimen. In general terms, NEON SPORT VOLT is an energy stimulant taken pre-workout, NEON SPORT KINETIC is an amino acid product used for general hydration purposes or during a workout, NEON SPORT SURGE is a testosterone supplement taken at a consistent time daily in the morning or afternoons, and NEON SPORT INTERCEPT is an estrogen and cortesol supplement taken after workouts and at bedtime. NEON SPORT VOLT and NEON SPORT KINETIC cost approximately $35 for a container containing roughly thirty servings and are sold in powder form, which the user mixes into water or the liquid of choice for consumption. NEON SPORT SURGE and NEON SPORT INTERCEPT cost approximately $60 for a container containing roughly thirty servings and are sold in capsule form.

In the instant motion, Altairia seeks a temporary restraining order (TRO) and a preliminary injunction (PI) requiring Defendants to: (1) discontinue selling in all GNC stores the NEON SPORT products; and (2) discontinue all advertisement of the NEON SPORT products, as well as discontinue issuing press releases promoting products bearing the name NEON ENERGY DRINK.

## Analysis

**I.   Legal Standard—TRO's and PI's**

Issuing a TRO or a PI is an "extraordinary and drastic remedy." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (internal quotation omitted). A TRO should issue only if the alleged harm is "immediate and irreparable." FED. R. CIV. P. 65(b). The Court may issue such extraordinary relief if the movant establishes "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (internal quotation omitted). Because TRO's and PI's are extraordinary remedies, the movant must "clearly carr[y] the burden of persuasion on all four requirements." *PCI Transp. Inc. v. Fort Worth & W.R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (internal quotations omitted).

**II.   Application**

Altairia has failed to meet its burden and convince the Court injunctive relief is an appropriate remedy at this stage of the litigation.

**A.   Altairia has not met its burden to show a substantial likelihood of success on the merits**

In order to show substantial likelihood of success on the merits, Plaintiff must show "the

mark is legally protectable and must then establish infringement by showing a likelihood of confusion." *Am. Rice Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (internal citations omitted). Without making any substantive determinations, the Court merely finds, for the purposes of the instant motion and based on a limited record, Altairia has failed to satisfy its burden concerning likelihood of confusion. Consequently, Altairia has not demonstrated a likelihood of success on the merits of its claims.

Likelihood of confusion is determined by looking at a series of eight factors, including "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Id.* (internal quotation omitted). The "[l]ikelihood of confusion means more than a mere possibility; the plaintiff must demonstrate a probability of confusion." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (internal citation omitted).

Altairia's case for confusion essentially amounts to two key facts. First, Altairia has a registered trademark in NEON ENERGY DRINK, issued by the USPTO in March 2013. Second, Woodbolt applied for trademarks for its NEON SPORT products, but the USPTO denied these applications in April 2013 on the grounds they were confusingly similar to Altairia's NEON ENERGY DRINK mark. *See* Pl.'s Mot. TRO and PI [##7-4, -5 ], Exs. 2–6. Despite these denials, Woodbolt proceeded to market with its NEON SPORT line of products in approximately May and June of 2013.[4] Based on this sequence of events, Altairia argues it has met its burden for likelihood

---

[4] At the hearing, Woodbolt's VP of Marketing, Daniel Lourenco, who also is the creator and marketer of the NEON SPORT products, testified he was entirely unfamiliar with NEON ENERGY DRINK until June 11, 2014, when his NEON SPORT Facebook page was blocked by Facebook management after receiving a complaint filed by Altairia.

of confusion.

The Court certainly finds these facts relevant and probative of confusion, but they are not the entire story. A denial by the USPTO of a trademark application on confusion grounds is not equal to a finding of likelihood of confusion in this Court. Indeed, "although an initial PTO determination by an examining attorney may be considered, it need not be given weight when the PTO attorney did not review all of the evidence available to the District Court." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000). Similarly, the Ninth Circuit has explained:

> Any such determination made by the Patent Office under the circumstances just noted must be regarded as inconclusive since made at its lowest administrative level . . . . The determination by the Patent Office is rendered less persuasive still by the fact that the Patent Office did not have before it the great mass of evidence which the parties have since presented to both the District Court and this court in support of their claims.

*Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970).

The Court is unclear, based on the current record before it, what the record before the USPTO was when it denied Woodbolt's applications. Certainly, Woodbolt was a party, but whether it had the opportunity to present evidence or object to the USPTO's findings is presently unknown. For now, the Court considers the USPTO's decision as a factor weighing in favor of a finding of confusion, and the Court turns its attention to the traditional likelihood of confusion factors.

### 1.   Strength of the mark

The Court examines the strength of Altairia's NEON ENERGY DRINK mark both

---

This testimony fell somewhere between strange and baffling considering: (1) Woodbolt's trademark applications were denied in April 2013, based specifically on confusion grounds with Altairia's NEON ENERGY DRINK mark; (2) Altairia's founder and CEO, Dakota Rea, was in relatively regular contact with Woodbolt's lawyer, Craig Spierer, beginning sometime near the end of 2012 or the beginning of 2013 all the way through the filing of Altairia's lawsuit, regarding these very trademark issues; and (3) the fact Woodbolt had been sued by Altairia on May 21, 2014, for trademark infringement. Either the channels of communication between Woodbolt's legal and business teams are non-existent or there is significant doubt surrounding Mr. Lourenco's testimony on this issue.

conceptually and commercially. From a conceptual standpoint, the word at issue in this dispute is "NEON," and Altairia has not presented evidence demonstrating why this is a particularly strong or unique mark. In fact, there is another earlier registered trademark for a beverage brand called "NEON BLAST," which sells "carbonated soft drinks, fruit juices and spring water." *See* Resp. [##17-2, -3], Scarpati Decl., ¶¶ 15–16, Exs. 13–14; *see also Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315–16 (5th Cir. 1981) (noting extensive third party use of the word "Sun" was impressive evidence there would be no likelihood of confusion). In addition, the NEON ENERGY DRINK mark appears to be, to a certain extent, descriptive, which weakens the mark. *See Sun Banks*, 651 F.2d at 315 (describing difference between a "fictitious, arbitrary or fanciful" mark, which is generally inherently distinctive and a strong mark afforded the widest ambit of protection, and a descriptive mark, which generally requires secondary meaning in order to warrant protection). Apparently, the NEON ENERGY DRINK's liquid beverage glows under certain conditions, which at least partially explains the name "NEON." Altairia has presented no evidence indicating NEON ENERGY DRINK has acquired secondary meaning.

From a commercial standpoint, NEON ENERGY DRINK has been on the market for approximately twelve months, eighteen at the most. While Altairia presented some evidence of sales, they do not appear to be so substantial as to have created a clear presence in the marketplace. *See* Defs.' Ex. 2 (Rea Aff.), Ex. B. (printout from Authorize.net reflecting Altairia's sales). Altairia's founder and CEO, Dakota Rea, testified his company was a small startup struggling to survive (albeit Rea believes this struggle is due in large part to Woodbolt's alleged anti-competitive behavior).

On the whole, Altairia has failed to establish the strength of its mark, and this factor weighs

against finding a likelihood of confusion.

### 2. Similarity between the marks

Certainly there is a similarity between Altairia's NEON ENERGY DRINK mark and one of Woodbolt's asserted marks like NEON SPORT VOLT. They both use the word "NEON," and use bright green and yellow colors on their products. *Compare* Pl.'s Ex. 7 (can of NEON ENERGY DRINK) *with* Defs.' Ex. 16 (canister of NEON SPORT VOLT). While they are not identical, the Court can see how a consumer might see these two marks and confuse the two. This factor supports a likelihood of confusion.

### 3. Similarity of the products

The products themselves, while sharing similarities, are different. Altairia's NEON ENERGY DRINK is a pre-canned energy drink beverage, similar to Red Bull or Monster. Rea indicated he pitches NEON ENERGY DRINK as the healthy alternative on the energy drink market. In contrast, Woodbolt's NEON SPORT products are more specifically dietary and nutritional supplements sold in powder and capsule form. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260–61 (5th Cir. 1980) (holding there is minimal similarity between pizza on the one hand, and sugar, salt, mustard, ketchup, and other condiments on the other, both sold under marks sharing the word DOMINO as "[a]bout the only things they have in common are that they are both edible") (internal quotation omitted). This factor suggests minimal confusion.

### 4. Distribution channels

Altairia and Woodbolt use different distribution channels. Altairia sells its product through direct sales, not in retail stores, as part of a multi-level marketing system using promoters to sell directly to customers and also to enroll other promoters. In contrast, Woodbolt's products are sold

by retailers (e.g., GNC) and on websites (e.g., GNC's website and bodybuilding.com). In other words, it is highly unlikely, if not impossible, the parties' respective products would ever end up "on the shelf" next to one another. Mr. Rea testified about the indirect effects of NEON SPORT sales in GNC on his business. For instance, a consumer who believes the two companies' products are the same might be inclined to just purchase the product at a GNC store on a per-container basis rather than in bulk through an Altairia distributor where he would also have to wait three-to-five days for the product to arrive in the mail. Nevertheless, an MLM's distribution channels are distinct from those in a retail sales model, which indicates a lack of likelihood of confusion.

5. **Target customers**

The target consumers for the respective products are different. Mr. Rea testified NEON ENERGY DRINK is meant for any consumer looking for "energy," be it a worker getting through the day, an after hours partygoer, or a student staying up late at night to study. Additionally, Mr. Rea represented his product targets those looking for a healthy alternative to, for instance, Red Bull or Monster as reflected in NEON ENERGY DRINK's promotional materials. *See* Defs.' Ex. 13. Daniel Lourenco, Woodbolt's VP of Marketing and the creator of the NEON SPORT products, testified NEON SPORT is for fitness and workout enthusiasts in search of supplements to enhance their focused exercise routines. The difference between these two groups of consumers suggests minimal confusion.

6. **Woodbolt's intent**

Mr. Lourenco testified Woodbolt has never sold its NEON SPORT products in liquid or beverage form. Furthermore, Woodbolt states in an affidavit it has no present plan to produce, market, or sell such a product. *See* Resp. [#17-5], Cunningham Decl., ¶ 4. Woodbolt represents it

never had, nor does it currently have, any intention of infringing Altairia's mark or selling energy drinks.[5] *Id.*, ¶ 6. Of course, the Court takes Woodbolt at its word, but to be safe, the Court, in denying Altairia's requested injunctive relief, explicitly gives leave to Altairia to re-file its motion for a preliminary injunction in the event Woodbolt markets or sells any pre-made and prepackaged liquid beverage under its NEON SPORT trade name. This factor weighs against a finding of a likelihood of confusion.

### 7. Degree of care exercised by potential purchasers

As stated above, purchasers of NEON ENERGY DRINK are those looking for a healthy alterative to energy drinks like Red Bull and Monster. As the Court understood Mr. Rea's testimony, Altairia sells large cartons full of individual cans of NEON ENERGY DRINK, typically to sales representatives, who then sell directly to a consumer or to another sales representative. Altairia sells a carton of twenty-four cans for approximately $72. End consumers can purchase on a per-can basis. In comparison, Woodbolt's consumers are those who are fairly serious about their exercise and fitness levels. NEON SPORT brand products cost roughly $40–$60, and sold as a thirty- or sixty-day supply. Common sense suggests consumers of NEON SPORT put time and effort into researching what exactly they are purchasing, and this relatively high degree of care further suggests a decreased likelihood of confusion between the NEON SPORT line of products and NEON ENERGY DRINK.

---

[5] One of Altairia's complaints (and one of the central motivating factors of this lawsuit) is an alleged recent press release indicating Woodbolt's plans to launch a new NEON ENERGY DRINK, which would pose a far greater threat to Altairia than Woodbolt's powder and capsule products designed for workout enthusiasts. Woodbolt has acknowledged this press release, but claims it was publicized without Woodbolt's consent. *See* Cunningham Decl., ¶ 5. According to Woodbolt, a modeling agency associated with one of its promotional agents posted blogs and conducted activities, without authorization, suggesting Woodbolt intended to market a NEON-branded energy drink beverage. *Id.* Woodbolt states it has taken immediate steps to remove the unauthorized press release. *Id.*, ¶ 7.

8.  **Evidence of actual confusion**

In its Motion for TRO and PI, Altairia presented merely conclusory statements of actual confusion. At the hearing, Altairia proffered evidence of actual confusion in the form of an email from a potential client concerned about confusion with NEON SPORT as well as affidavits from two sales representatives stating they had each encountered potential customers who expressed confusion between NEON ENERGY DRINK and the NEON SPORT products. While much, if not all, of this evidence is hearsay, the Court considers it for present purposes as some evidence of actual confusion. Mr. Lourenco testified he has never been contacted by anyone who was confused between the NEON SPORT products and NEON ENERGY DRINK. Considering these conflicting reports, this factor is neutral in the confusion analysis.

In sum, the Court concludes Altairia has failed to meet its burden concerning a likelihood of confusion. While the Court is concerned with Woodbolt's march to market despite being explicitly told by the USPTO its claimed marks were confusingly similar to Altairia's mark, there are still substantial factual issues based on the limited record before the Court at this juncture concerning likelihood of confusion.

B.  **Altairia has not met its burden to show a substantial threat of irreparable injury if the injunction is denied**

To be entitled to preliminary injunctive relief, Altairia must show the alleged injury is "immediate and irreparable." FED. R. CIV. P. 65(b). The mere possibility of irreparable harm is not enough; the threat of irreparable harm must be likely. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Altairia has failed to demonstrate irreparable harm is likely if the Court does not grant its

requested relief. Mostly, Altairia's evidence on the issue amounts to Mr. Rea's belief his company will soon be out of business as a result of Woodbolt's activities. Altairia is not, however, able to provide any compelling evidence of a decrease in sales as a result of Woodbolt's sales of NEON SPORT products. There is no evidence Altairia's sales representatives are buying less from Altairia or any evidence end-use consumers are purchasing less from the sales representatives.

In addition, the Court notes Woodbolt, along with its co-Defendant GNC, are capable of paying the judgment Altairia would obtain if it were to eventually prevail in this lawsuit. Altairia contends money damages cannot compensate them for the damage to its brand and goodwill caused by Woodbolt and GNC's penetration into the market. Considering Altairia is a small company struggling to survive and has only been on the market itself for roughly one year, the Court fails to see these concerns as substantial. Money damages would be an adequate remedy.

**C.    Altairia has not met its burden to show the threatened injury if the injunction is denied outweighs the harm to Woodbolt if the injunction is granted**

If the Court were to grant the requested injunction, Woodbolt would suffer significant harm, including: (1) the cost of pulling approximately $3 million worth of NEON SPORT inventory off the shelves of GNC; (2) the cost of lost sales, which amount to roughly $10 million per year; (3) damage to retailer faith developed with GNC and bodybuilding.com; and (4) damage to consumer faith. In particular, the potential damage to Woodbolt's relationship with GNC is significant, both because losing a distributor of the size and influence of GNC would be devastating and because GNC may have legal rights against Woodbolt in the event of an injunction. The threatened harm to Woodbolt if an injunction were granted far outweighs the threatened injury to Altairia in the event an injunction is denied.

## Conclusion

Altairia has failed to meet its burden on the elements for a preliminary injunction. On the limited record established by the parties' briefing and the hearing held before this Court, there are substantial fact issues on the merits of Altairia's claims. The allegations, however, are by no means frivolous. Altairia had a registered trademark, and Woodbolt's trademark applications had been denied by the USPTO on the grounds of confusion. Undeterred, Woodbolt, through its lawyer, attempted to obtain Mr. Rea's signature on a "Co-Existence Agreement," which would insulate it from liability if it took its products to market as planned. Unable to procure said signature, Woodbolt still proceeded to pack the shelves of GNC across the country with millions of dollars worth of dietary supplements and establish a stream of revenue already amounting to roughly $10 million per year. These allegations support the classic case of a large company running roughshod over a less sophisticated small company struggling to gain a foothold in the marketplace, and doing so in a manner demonstrating minimal regard for legal restraints. A jury may well agree with this version of events.

For now, however, injunctive relief would not be an appropriate remedy, and the two companies may continue with their respective businesses. The Court, though, outlines two future events, which, if they were to occur, would cause it to reconsider its position on a preliminary injunction. These potential scenarios, in general terms, are: (1) if Woodbolt markets or sells any prepackaged liquid beverage products under its NEON SPORT trade name; or (2) if Woodbolt markets or sells any of its NEON SPORT products in the United States through distribution channels other than (a) General Nutrition Corporation retail stores, (b) General Nutrition Corporation's website, or (c) bodybuilding.com.

Accordingly,

IT IS ORDERED that Plaintiff Altairia Corporation's Motion for Temporary Restraining Order and Preliminary Injunction [#7] is DENIED. Altairia may re-file its motion for a preliminary injunction in the event Defendant Woodbolt LLC either: (1) uses the trade name NEON SPORT or any derivatives or formative names thereof, including specifically NEON SPORT VOLT, NEON SPORT KINETIC, NEON SPORT SURGE, and NEON SPORT INTERCEPT, or Plaintiff Altairia's NEON ENERGY DRINK mark in connection with the marketing, sale, and distribution of any pre-made and prepackaged liquid beverage; or (2) markets or sells any of its NEON SPORT products in the United States through distribution channels other than (a) General Nutrition Corporation retail stores, (b) General Nutrition Corporation's website, or (c) bodybuilding.com;

IT IS FINALLY ORDERED that Plaintiff Altairia Corporation's Motion for Substituted Service [#9] is DISMISSED AS MOOT.

SIGNED this the 7th day of July 2014.

/s/ Sam Sparks
SAM SPARKS
UNITED STATES DISTRICT JUDGE